**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **[UNDER SEAL],** | |
| **Plaintiffs,** | **CIVIL CASE NO.** |
| **-against-** | **FILED *IN CAMERA* AND** <u>**UNDER SEAL**</u> |
| | **Jury Trial Demanded** |
| **[UNDER SEAL],** | |
| **Defendant.** | |

<u>**FALSE CLAIMS ACT COMPLAINT**</u>

# DO NOT FILE ON PACER

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| **UNITED STATES OF AMERICA and STATE OF NEW YORK, *ex rel.* GREGORY LEVISON, R.PH and GEORGE KOLWASKI, R.PH**<br><br>**Plaintiffs/Relators,**<br><br>v.<br><br>**CVS HEALTH CORPORATION,**<br><br>**Defendant.** | **CIVIL CASE NO.**<br><br>**FILED *IN CAMERA* AND <u>UNDER SEAL</u>**<br><br>**Jury Trial Demanded** |

## <u>FALSE CLAIMS ACT COMPLAINT</u>

*Qui Tam* Plaintiffs/Relators, Gregory Levison, R.Ph ("Levison"), and George Kowalski, R.Ph ("Kowalski" and, together with Levison, "Plaintiffs" or "Relators"), bring this action against CVS Health Corporation ("CVS" or "Defendant") on behalf of the United States of America and the State of New York and allege, based upon personal knowledge[1] and relevant documents[2], as follows:

## <u>NATURE OF THE ACTION</u>

1.      This is an action to recover damages and civil penalties against the Defendant under the Federal Civil False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.* and the New York State False Claims Act ("NY FCA"), NY Fin. Law, ch. 13 §§ 187, *et seq.* for false claims that Defendant presented to Medicare, Medicaid, other federal healthcare programs and New York State healthcare programs (collectively, the "government"), and to recover damages under the common

---

[1] *See* Exhibits A (Affidavit of Levison) and B – (Affidavit of Kowalski)
[2] Relevant documents in the Relators' possession are attached as exhibits hereto and/or to the written disclosures submitted herewith.

law theories of payment by mistake and unjust enrichment. This action arises out of CVS's fraudulent and illegal practices of intentionally obtaining payment by the government for prescriptions that were never fully dispensed (the "Full Bill, Partial-Fill" scheme) for eligible recipients covered by federal or state-funded programs.

2.     CVS knowingly submitted or caused to be submitted false and fraudulent claims to the government through its Full-Bill, Partial-Fill scheme.

3.     Each time CVS billed for the value of a full prescription while only a portion of the prescribed medication was delivered to the patients, it overbilled the government and committed multiple fraud and abuse violations.

4.     Through the Full-Bill, Partial-Fill scheme, it is estimated that CVS has defrauded the United States of America and the State of New York out of over one hundred million dollars ($100,000,000.00) for prescriptions that were never fully dispensed.

**CVS's Full-Bill Partial Fill Scheme and The Continue to Dispense Loophole**

5.     When encountering a prescription where there is insufficient inventory, a pharmacy must supply a minimum day's supply, usually a three (3)-day supply per industry standard and then order the out-of-stock medication for the next day. This three (3)-day supply is referred to as a partial-fill. This three (3)-day supply **must be given at no charge pursuant** to the Centers for Medicare and Medicaid Services ("CMS") Fraud, Waste, and Abuse guidelines[3]. Moreover, the pharmacy is prohibited from billing the government until the prescription is completely filled, in essence loaning the three (3)-day supply of medication until the inventory is replenished and the prescription is filled in full.

---

[3] *See* Exhibit C (Medicaid CMS Pharmacy Self-Audit).

6.      Throughout the relevant time period, CVS exploited a loophole in their pharmacy processing system (CVS's software's "Continue to Dispense" bypass), which enables employees to bypass the legally compliant method of only billing the United States and the State of New York once the patient has received the full quantity of medication for filling partially–filled prescriptions. The bypass option given to the pharmacist to illegally fill partial-fills, bills insurance programs for the full amount of a prescription while actually dispensing short supplies of medication, ensuring that they collect the full payment regardless of whether or not the full balance of the prescription is dispensed to the patient. This loophole overcharges both the government who has reimbursed CVS for the full prescription price as well as patients who pay the full cost sharing portion, or copay, regardless of the quantity actually dispensed. While each prohibited transaction is an individual false claim under the Act, the monetary theft occurred when the owed medication from the partial-fill was never picked up, and was then returned to stock without reimbursing the government.[4]

7.      There is no legal function of the "Continue to Dispense" bypass in the CVS system.

8.      Through the exploitation of their software's "Continue to Dispense" bypass, CVS committed false claims and also unjustly profited from patients who did not pick up the remainder of the partially-filled medication by charging them and their insurance company the full amount upfront when the patient picked up the original partial supply.

9.      This is significant because for every "completion filled" prescription that is not picked up by the patient after between ten and fourteen (10-14) days from the fill date, CVS returns the unused medication to stock, allowing CVS to replenish its inventory at the expense of the third-party/government and the patient, who have already paid for the medication in full.

---

[4] *Id.*

10.     This is particularly egregious because CVS previously paid a penalty to the United States Treasury in 2002 and 2005 for the very same conduct and is thus, a repeat offender.[5]

11.     The "Full-Bill, Partial Fill" scheme begins when the pharmacist is alerted by the system that the drug they are trying to dispense does not have sufficient "on-hand" quantity. First, the pharmacist executing the fraud selects the "Continue to Dispense" bypass option, which is triggered when the computer detects an insufficient quantity. This option is a red flag for pharmacists to either correct the inventory or dispense a no-cost partial-fill. It also allows for the rapid processing of the prescription and the reconciliation of the "on-hand" quantity at a later time at the cost of stealing from the government. The "Continue to Dispense" functionality allows for continuous workflow and circumvention of the proper protocol, which violates the federal FCA and the NY FCA.  Second, as a result of using the "Continue to Dispense" function in order to perform an illegal partial-fill, the system automatically triggers a "Cycle Count" of the medication by the software system which now believes that the drug in question has insufficient inventory to complete the prescription. A "Cycle Count" is simply a computer-generated list of medications that must be hand-counted to reconcile potential inventory inaccuracies. CVS's workflow dictates that all cycle counts must be completed before six o'clock in the evening (6:00 PM) each day, which is immediately prior to the automatic inventory order that is generated and released to the supplier (the "supplier order"). The supplier order is an in-house order to CVS's warehouse delivered to their pharmacies once or twice a week.

---

[5] *See* Exhibits D (US v. Eckerd Corp. 5/15/02 Settlement Agreement), E (The Wall Street Journal Article: 7/25/05 - CVS Will Settle Medicaid Billing Case*). See also* Exhibits I (Department of Justice Release: 6/25/04 – Wal-Mart to Pay $2.8 Million….), J (Department of Justice Release: 9/15/99: Walgreen Co. Pays $7.6 Million….), K (Settlement Agreement between the United States, et al. and Rite Aid Corporation) and L (Department of Justice Release: 10/9/14: Manhattan U.S. Attorney Settles Civil Fraud Claims Against Caremed….) (collectively showing additional notice of illegal conduct within the industry).

12.     Third, when the balance of an illegal partial-fill has been left in the pickup bin for a period of ten to fourteen (10-14) days, it must be returned to stock. Because illegal partial-fills are not documented in the software, the CVS employee will have to bypass the normal process through one (1) of two (2) fraudulent means, neither of which reimburse the government.  The first fraudulent means is the use of the "Custom Return to Stock" label generation process which allows the return of the medication to active inventory by informing the computer of the drug, dosage form and quantity to be returned back to pharmacy inventory, thus causing an increase in the "on-hand" quantity in the exact amount of the fraud.  The second method is by bypassing the "Custom Return to Stock" process, and simply placing the pills back into inventory which then equally impacts the "on-hand" quantity and is revealed upon the subsequent "Cycle Count" of that medication.

13.     CVS promoted inventory manipulation and used the pharmacists' compensation review to incentivize pharmacists into illegally processing partial-fill orders. CVS developed a series of review metrics that impact pharmacist compensation by rewarding them for fewer proper partial-fills and more for illegal partial-fills created via the "Full-Bill, Partial Fill" scheme and the unlawful "Continue to Dispense" mechanism. The nature of a key component of the bonus and merit calculations are such that if a pharmacist completes a large number of partial-fills properly, it reflects negatively on the pharmacist's ability to manage inventory and ultimately their bonus and merit raises.

14.     The extent of partial-fill damages is ascertainable through forensic inventory assessment of their internal daily reports detailing the medication quantity "on-hand" or "in stock." For each illegal partial-fill, the "on-hand" inventory will have discrepancies, with traceable

fingerprints through the tracking of three functions: "Continue to Dispense," "Cycle Count" reporting, and "Custom Return to Stock" label reports.

**Damages Calculations**

15.     Changes in the "on-hand" quantity caused by these three (3) markers show both: (1) when a partial fill was fully billed, which indicates an individual false claim punishable by eleven-thousand one hundred and eighty-one to twenty-three thousand three hundred and thirty-one dollars ($11,181.00 to $23,331.00) fine per transaction under both the FCA and NY FCA; and (2) the balance owed that is returned back into inventory without reimbursement to the government.

**(1) Statutory Damages Traceable Through the Continue to Dispense Data Log**

16.     Each false claim is traceable through pulling the "Continue to Dispense" data log and examining the inventory adjustments made to the same drug transaction caused by the "Cycle Count."

**(2) Monetary Damages**

17.     The extent of monetary damages is then ascertainable through either tabulating the "Return to Stock" quantities ten to fourteen (10-14) days after the initial transaction or comparing the difference between the initial "Cycle Count" adjustment with the subsequent "Cycle Count" adjustment to the same drug.

18.     As is explained more fully in the "DAMAGES" section, Relators estimate a nationwide annual monetary loss to the government exceeding one hundred twenty-seven million dollars ($127,000,000.00), with eleven million dollars ($11,000,000.00) attributed to New York in 2018, not including penalties which increases the amount owed to the government to over three billion eight hundred million dollars ($3,800,000,00.00) in 2018 alone. total damages including

statutory fine and monetary damages, as shown above, equate to over three billion eight hundred million dollars ($3,800,000,000.00) owed to the government as a result of the fraudulent scheme set forth herein in 2018 alone.[6]

## JURISDICTION AND VENUE

19.    This Court has jurisdiction over the claims brought under the FCA pursuant to 31 U.S.C. § 3730(a), and 28 U.S.C. §§ 1331 and 1345, and over the common law claims pursuant to 28 U.S.C. § 1345 and parallel provisions of the NY FCA.

20.    This Court may exercise personal jurisdiction over Defendant pursuant to 31 U.S.C. § 3732(a), which provides for nationwide service of process.

21.    Venue is proper in this District under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b), because Defendant transacts business in this District, and a substantial part of the events giving rise to this Complaint occurred within this District. CVS submitted claims for prescription drugs dispensed to individuals who lived in this District.

## PARTIES

**Relators**

27.    <u>Relator Levison</u>, worked for CVS from 2008 through 2019, and worked for CVS in New York from 2015 to 2019, is a citizen of the United States and a resident of the State of New Jersey.

28.    Levison was the overnight pharmacist at CVS located at 3775 East Tremont Ave, Bronx, NY 10465. He also floated as a part-time pharmacist for CVS in stores 2445, 6048, 144, 2360, and 7067.

---

[6] *Id.*

29.     Levison has been a licensed pharmacist in good standing from 1996 until 2020 and has active licenses in New Jersey, New York and California. His Pennsylvania license is currently inactive. He has practiced in all four (4) states.

30.     Levison was thus in a unique position to witness Defendant's fraudulent misconduct on a broad scale. Levison's personal knowledge of Defendant's illegal conduct is supported by his own personal investigation undertaken to further develop and substantiate the allegations set forth in this Complaint concerning Defendant's activities.

31.     Relator Kowalski is a citizen of the United States and a resident of the State of Wisconsin.

32.     Kowalski is an expert in pharmacy practice, pharmacy operational management and retail pharmacy management.

33.     Kowalski has been the key expert in several legal cases involving pharmacy practice dating back to 2000.

34.     Kowalski has been a pharmacist in good standing since 1987 and has licenses in New Jersey and Wisconsin.

35.     Kowalski has over twenty-five (25) years in the practice of pharmacy.  Kowalski's professional experience consists of operational management, retail pharmacy management, primary and secondary pharmacy benefit manager ("PBM") contracts negotiation and primary vendor contract negotiation. He has held full profit and loss ("P&L") responsibility at Roudy's, Cordant and Advocate Aurora Health.

**Defendant**

36.     Defendant CVS is a Delaware corporation whose principal place of business is located at One CVS Drive, Woonsocket, RI 02895.

37.     The acronym CVS stands for "Consumer Value Stores" and the corporation has been in the retail pharmacy business since 1963.

38.     CVS has two hundred and fifty-six billion dollars ($256,000,000,000.00) in annual sales in 2019 and was ranked fifth in Fortune 500 in 2019.

39.     In the past, CVS has committed numerous false claim violations and has settled numerous FCA lawsuits alleging Medicaid fraud, resulting in corporate integrity agreements, and penalties in the hundreds of millions of dollars.

40.     Furthermore, in 2010, CVS entered into a settlement agreement with the federal government for seventy-seven and a half million dollars ($77,500,000.00) for violating the Combat Methamphetamine Epidemic Act of 2005.

41.     CVS owns and operates approximately nine thousand nine hundred sixty-seven (9,967) stores in forty-nine (49) states, the District of Columbia and Puerto Rico. CVS owns and operates at least five hundred seventy-nine (579) stores in the State of New York, within which fifty-nine (59) stores are in the five (5) boroughs of New York City, which includes twenty (20) stores in Staten Island, fourteen (14) stores in the Bronx, twenty-eight (28) stores in Brooklyn, four (4) stores in Manhattan and one (1) store in Queens.

## APPLICABLE LAW

### I.     FEDERAL FALSE CLAIMS ACT

42.     The FCA is the government's primary civil remedy to redress false claims for government funds and property. False claims actions filed under the whistleblower, or *qui tam*, provisions allow private citizens to file lawsuits alleging false claims on behalf of the government.

43.     The statute imposes liability on a defendant when: (1) the defendant presents (or causes to be presented) a claim for payment or approval; (2) the claim is false or fraudulent; and

(3) the defendant's acts are undertaken "knowingly." 31 U.S.C. § 3729 (a)(1)(A). For purposes of this statute, "knowingly" is not limited to "actual knowledge" but also includes deliberate ignorance or reckless disregard of truth or falsity, and "require[s] no proof of specific intent to defraud." 31 U.S.C. § 3729 (b)(1).

44.     The FCA prohibits the use of false records or statements to get a false or fraudulent claim allowed or paid under 31 U.S.C. § 3729(a)(1)(B) and prohibits conspiracies "to defraud the government by getting a false or fraudulent claim allowed or paid" under 31 U.S.C. § 3729(a)(1)(C).

45.     FCA claims include "any request or demand…for money or property" if any portion thereof comes from the federal government. 31 U.S.C. § 3729(b)(2)(A).

46.     The FCA states that a person is liable if he or she "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government" under 31 U.S.C. § 3729(a)(1)(G).

47.     Violators are subject to a civil penalty of eleven thousand one hundred and eighty-one dollars ($11,181.00) to twenty-three thousand three hundred thirty-one dollars ($23,331.00) per claim (five thousand five hundred dollars ($5,500.00) to eleven thousand dollars ($11,000.00) as adjusted inflation as of January 15, 2021), plus three (3) times the amount of damages sustained by the government. 31 U.S.C. § 3729(a).

48.     Pursuant to § 3730 (b)(2) of the FCA, as well as the relevant of provisions of the NY FCA, this Complaint is to be filed in camera and remain under seal for a period of at least sixty (60) days and shall not be served on the Defendant until the Court so orders. The United States of

America, acting by and through the Department of Justice, may elect to intervene and proceed with this action, within a period of sixty (60) days, after it has received both the Complaint and the statement of material evidence and information relating to the instant action.

49.     Pursuant to § 3730 (b)(2) of the FCA, as well as the relevant of provisions of the NY FCA, the Relators have provided to the Attorney General of the United States and to the United States Attorney for the Commonwealth of New York, simultaneous with the filing of the instant Complaint, a statement of material evidence and information. The statement of material evidence and information supports the Relators' assertions and contentions regarding the submission of false claims by the Defendant, CVS, for payment of prescription drugs by the government for eligible recipients.

## II.     NEW YORK FALSE CLAIMS ACT

50.     The NY FCA is the New York State's primary civil remedy to redress false claims for New York State funds and property. False claims actions filed under the whistleblower, or *qui tam*, provisions allow private citizens to file lawsuits alleging false claims on behalf of New York State.

51.     The NY FCA became effective in April of 2007 and is modeled after the FCA.

52.     The NY FCA § 189(1)(a) applies to any person who knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval.

53.     The NY FCA § 189(1)(b) applies to any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

54.     The NY FCA § 189(1)(d) applies to any person who has possession, custody or control of property or money used, or to be used, by the state or a local government and knowingly delivers, or causes to be delivered, less than all of that money or property.

55.     NY FCA §189(1)(g) applies to any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state or a local government.

56.     For purposes of the NY FCA, the terms "knowing" and "knowingly" mean that with respect to a claim, or information relating to a claim, a person: (a) has actual knowledge of such claim or information; (b) acts in deliberate ignorance of the truth or falsity of such claim or information; or (c) acts in reckless disregard of the truth or falsity of such claim or information.

57.     Violators are subject to a civil penalty to the state or local government of eleven thousand one hundred and eighty-one dollars ($11,181.00) to twenty-three thousand three hundred thirty-one dollars ($23,331.00) per claim (six thousand dollars ($6,000.00) to twelve thousand dollars ($12,000.00) as adjusted to be equal to the civil penalty allowed under the FCA, as adjusted for inflation) pursuant to §189(1)(h) of the NY FCA and recoverable damages three (3) times the value of the amount falsely received.

## III.     BACKGROUND ON FEDERAL AND STATEFUNDED HEALTH INSURANCE PROGRAMS

### A.     <u>The Medicaid Program</u>

58.     The Congress of the United States, with the enactment of Title XIX of the Social Security Act of 1965 ("SSA"), established the Medicaid program. 42 U.S.C. §1396 *et seq*.

59.     The Medicaid program was established by the federal government to create a means by which health care services could be provided to indigent and disabled people.

60.     Medicaid is the largest source of funding for medical and health-related services for America's poorest people.

61.     Medicaid is a cooperative federal-state public assistance program which is

administered by the states.

62.     Funding for Medicaid is shared between the federal government and those state governments that choose to participate in the program.

63.     Title XIX of the SSA allows considerable flexibility within the states' Medicaid plans and therefore, specific Medicaid coverage and eligibility guidelines vary from state to state.

64.     However, in order to receive federal matching funds, a state Medicaid program must meet certain minimum coverage and eligibility standards. A state must provide Medicaid coverage to needy individuals and families in five broad groups: pregnant women; children and teenagers; seniors; people with disabilities; and people who are blind. In addition, the state Medicaid program must provide medical assistance for certain basic services, including inpatient and outpatient hospital services.

65.     The New York Medicaid program is administered by the New York State Department of Health ("DOH"). Determinations of enrollee eligibility are made by the fifty-eight (58) county New York Departments of Social Services ("NY DSS") and the New York City Human Resources Administration ("HRA").

66.     The Federal Medicaid Assistance Percentage ("FMAP") for the State of New York is currently fifty percent (50%). This means that the federal government provides fifty percent (50%) of the funding for New York Medicaid, and the remaining fifty percent (50%) of the fund is paid by the State of New York.

67.     At all times relevant to this Complaint, it was a violation of federal law, including 42 U.S.C.§§ 1320a-7b(a)(1), 1320a-7b(a)(2), 1320a-7, 1320a-7a and 1001.101(a)(1), to make false statements or representations of material facts with respect to requests for payment under Medicaid, Medicare and state health care programs.

B.     **Medicare**

68.     In 1965, at the same time that Medicaid was created, Congress established Title XVIII of the SSA, 42 U.S.C. §§ 1395 *et seq*., the Health Insurance for the Aged and Disabled Program, commonly referred to as "Medicare.," to pay for the cost of certain medical services, including outpatient physical therapy services, for persons sixty-five (65) and older, and for persons with disabilities. *See* 42 U.S.C. § 1395k(a)(2)(C).

69.     Pursuant to the Medicare program and other government healthcare programs described below, the government pays claims for reasonable and necessary healthcare provided to its beneficiaries.

70.     Medicare has multiple parts:

a.     Medicare Part A, the Basic Plan of Hospital Insurance, covers the cost of inpatient hospital services, hospice services and related care.

b.     Medicare Part B, the Voluntary Supplemental Insurance Plan, covers the cost of physicians' services and outpatient diagnostic tests.

c.     Medicare Part C, the Medicare Advantage program, covers both Part B and C and can cover additional services through plans administered by private insurance companies.

d.     **Medicare Part D, the Medicare Prescription Drug Benefit, covers the costs of prescription drugs and is also available as part of Part C Medicare Advantage plans.**

71.     Critical to the continued solvency and viability of Medicare and other government health programs is that healthcare providers bill only for prescription drugs that are actually prescribed and dispensed.

72.     The Department of Health and Human Services ("HHS") is responsible for the funding administration and supervision of the Medicare program. The Center for Medicare Services ("CMS") is the division of HHS that is directly responsible for the administration of Medicare. Reimbursement for Medicare claims is made by the United States through CMS. CMS, in turn, contracts with private insurance companies to receive, review and pay appropriate claims for outpatient physical therapy services from the Medicare Trust Fund. *See* 42 U.S.C. § 1395h and 42 U.S.C. § 1395u. In this capacity, the insurance carriers act as fiscal intermediaries on behalf of CMS.

73.     To participate in the Medicare program, a healthcare provider must enter into a contract with CMS in which the provider agrees to conform to all applicable statutory and regulatory provisions relating to Medicare payments and reimbursements. *See* 42 U.S.C. § 1395cc. For example, healthcare providers participating in the Medicare program must:

(a) Refrain from making false statements or misrepresentations of material facts concerning payment requests;

(b) Not bill for any services or products that were not performed or delivered in accordance with all applicable policies;

(c) Be fully licensed and/or certified under all applicable state and federal laws to perform the services provided to the recipients;

(d) Comply with the applicable state and federal statutes, policies and regulations;

(e) Not engage in any illegal activities related to the furnishing of services or products to recipients;

(f) Must accept the "allowable charge" as determined by Medicare as full payment for covered services. *See* 42 U.S.C. § 1395, *et seq.*

16

74.     At all times relevant to the Complaint, Defendant was a participating Medicare provider. Thus, at all times material to this Complaint, Defendant was required to obey all federal and state laws and regulations governing Medicare providers, including the FCA and NY FCA which prohibit: (1) False statements and certifications when applying for any benefit or payment under Medicare laws; and (2) Presenting or causing to be presented any false or fraudulent claims under Medicare. *See* 42 U.S.C. § 422.504(h)(1).

i.   Payment of Prescription Drug Claims under Medicare Part D

75.     The Medicare prescription drug benefits program known as Medicare Part D became effective January 1, 2006, as part of the Medicare Prescription Drug Improvement and Modernization Act of 2003. 42 U.S.C. § 1395w-101(a)(2).

76.     The United States annually pays approximately seventy-five to eighty percent (75 -80 %) of the cost of providing covered drugs to Medicare Part D beneficiaries, however, the United States does not pay pharmacies directly. Rather, the United States pays Medicare Part D plan sponsors, which are typically private insurance companies, to reimburse retail pharmacies, (called "downstream entities" under 42 C.F.R. § 423.4 or "network pharmacies"), either directly or through contractors known as pharmacy benefit managers ("PMB").

77.     Thus, when a pharmacy such as CVS dispenses a drug to a Medicare beneficiary, it submits an electronic claim to the beneficiary's Part D plan and receives payment from the Part D plan sponsor for the price remaining after the beneficiary pays his or her portion of the price of the prescription drug.

78.     In the pharmacy industry, the PBM third-party administrators typically act as intermediaries between retail pharmacies and insurers, facilitating the processing and payment of

prescription drug claims, including the payment of reimbursement monies to pharmacies and the submission of cost data to the government on behalf of the Part D plan sponsor.

79.     CVS, as a contract provider for a Part D plan sponsor, is required to comply with all applicable "federal laws, regulations, and CMS instructions." 42 C.F.R. § 423.505(i)(4)(vi).

80.     CVS also expressly "agrees to comply with Federal laws and regulations designed to prevent fraud, waste, and abuse, including, but not limited to, applicable provisions of Federal criminal law [and] the False Claims Act." 32 U.S.C. §§ 2729 et seq. 42 C.F.R. 423.505 (h)(l).

81.     Under Medicare part D, CMS will only pay for drugs dispensed with a valid prescription. 42 U.S.C. §1395w-102(e).

82.     CVS, as a contract provider for a Part D plan sponsor, is also required to comply with all applicable pharmacy and prescription drug state standards as part of its contractual agreement. 42 C.F.R. § 423.504(b)(iv)(A).

83.     CVS, as a contract provider for a Part D plan sponsor, certifies that the claims data it submits to the government agencies is accurate, complete, and truthful and that the claims data will be used to obtain government payments. 42 C.F.R. 423.505 (k)(3).

84.     As a contract provider for a Part D plan sponsor, through PBMs and the sponsor, CVS sends data to CMS to support its claims for government payment on a Prescription Drug Event ("PDE") record.

85.     The PDE record must include accurate data including the drug dispensed, the prescription number, the dispensing fee paid to the pharmacy, the cost of the drug, the quantity dispensed, and the provider who ordered the medication, including the provider's unique identifying number assigned by the licensing state or district.

86.     Compliance with the requirement that such PDE data is "true, accurate, and complete" is a condition of payment under the Medicare Part D program.

87.     PDEs submitted to Medicare for prescription medication dispensed without the prescribed drug quantity or accurate expiration date do not contain accurate, complete, and truthful information about all data related to payment and are thus false claims for payment.

88.     As a result of CVS's fraudulent scheme, CMS has, through Part D plan sponsors and/or PBMs, made payments to CVS for Part D claims submitted with materially false PDA data.

ii. <u>Specific Medicare Part D Obligations of Retail Pharmacies</u>

89.     In addition to submitting factually accurate prescription claims data to Part D Sponsors to enable accurate claims to CMS, retail pharmacies like CVS are subject to both state and federal laws and regulations governing the dispensing of prescription medications, intended to enhance patient safety and prevent fraud against the government.

90.     One related, critical "condition for contracting with CMS to offer Part D benefits" is thus to "have compliance plans that help [Sponsors] follow Federal regulations and prevent fraud, waste, and abuse. Among other elements that CMS requires, these plans must include effective annual training and education to prevent fraud, waste, and abuse for network pharmacies." *See OIG, Medicare Drug Plan Sponsors' Training to Prevent Fraud, Waste, and Abuse, OEI-01-10-00060, July 2011;* 42 CFR § 423.504(b)(4)(vi).

iii. **Training and Education Requirements**

91.     Although CMS does not detail the exact nature of the training required, such training and education must be "effective."

92.     Indeed, such training and education is critical because, as introduced above, "CMS requires that any entity that generates [Part D claims data on behalf of a sponsor," must:

a.  Certify to CMS the accuracy, completeness, and truthfulness of that data; and

b.  Acknowledge that the data will be used for purposes of obtaining Federal reimbursement. *See* 42 C.F.R. § 423.505(k)(3)

93.  In fact, CMS has specifically identified common fraud schemes, including two (2) of the schemes to submit false claims set forth in detail herein and CMS requires that such training be designed to address the prevention of such false claims.

94.  CVS's training is not "effective" in this regard. *See CMS, Medicare Prescription Drug Benefit Manual*, Pub. No. 100-18, ch. 9, §50.3.

95.  CMS specifically requires that CVS's training include examples of "reportable non-compliance" such as 1) "shorting prescriptions" and 2) billing for medication in a way that does not match what was prescribed, as well as a mandate to report "actual or suspected Medicare program noncompliance or potential Fraud, Waste, and Abuse". *See CMS, Medicare Prescription Drug Benefit Manual*, Pub. No. 100-18, ch. 9, §50.3.1; Appendix B.

### iv. <u>Expiration Dates</u>

96.  The PDE submission form specifically requires pharmacies to identify "the dispensed drug using a National Drug Code" ("NDC"), an eleven (11)-digit number assigned to the drug by its manufacturer and attached to the product container at the time of packaging.

97.  The NDC identifies the product manufacturer, dose form and strength, and package size. NDCs must be assigned pursuant to federal drug law. 21 C.F.R. § 210.25(c)(l).

98.  In turn, 21 C.F.R. §§21 l.137(a) and (d) require manufacturers or labelers to assign an expiration date to each pharmaceutical product. Using the drug products' NDCs, CMS keeps track of expiration dates in a Medicare Part D "data bank" to monitor the expiration for all drugs covered by the Medicare Part D program.

99.     Moreover, in addition to submitting accurate prescription data, retail pharmacies participating in Medicare Part D must dispense Part D drugs in accordance with applicable state pharmacy laws and regulations., many of which in turn expressly require that retail pharmacies dispense drugs with accurate expiration date information. *See* 42 C.F.R. §§ 423.504(b)(4)(iv)(A), 423.153(c)(l) and 21 C.F.R. § 211.137. *See also, e.g.*, Wis. Admin. Code DRS § 132.65(6); Pennsylvania Pharmacy Code § 27.14(b); Ohio Revised Code, 3715.521(A); ; and Illinois Code § 725.20.

### C.     **TRICARE/CHAMPUS & CHAMPVA**

100.    In addition to Medicare and Medicaid, the federal government administers other health care programs including, but not limited to, TRICARE/CHAMPUS, CHAMPVA, and federal workers' compensation, all of which have been defrauded by CVS as described with particularity herein.

101.    TRICARE/CHAMPUS, administered by the United States Department of Defense, is a health care program for individuals and dependents affiliated with the armed forces. 10 U.S.C. §§ 1071 et seq.; 32 C.F.R. § 199.4(a).

102.    CHAMPVA, administered by the United States Department of Veterans Affairs, is a health care program for the families of veterans with one hundred percent (100 %) service connected disability. 38 U.S.C. §§ 1781 *et seq*.; 38 C.F.R. § 17.270(a).

### **STATEMENT OF FACTS**

I.     **THE CVS SOFTWARE "CONTINUE TO DISPENSE" LOOPHOPE THAT DRIVES THE "FULL-BILL, PARTIALFILL" FALSE CLAIMS CAUSES A CASCADE OF INVENTORY CHANGES THAT PINPOINT THE MAGNITUDE OF CORPORATE THEFT**

103.    The sources of payment for the prescriptions filled by CVS pharmacists come from cash-paying customers and third-party payers, which include the Medicaid and other New York State funded health plans for eligible recipients.

104.    All prescription claims are identified by a prescription number, an internal transaction number assigned by the software system, and a transaction number assigned by the processing insurance company or PBM. Fraudulent claims would possess each of these identifiers.

105.    These identification numbers link a prescription with patient demographics along with insurance information. From this data, Medicare, Medicaid, TRICARE, FEHB and Medicare Part D and other New York State funded health plan claims that have been wrongfully billed, can be identified.

106.    CVS implements and maintains uniform store operating procedure for the operating of their pharmacies throughout the United States.

107.    From daily inventory management, through individual transaction inventory reconciliation, to daily computer-generated inventory audit lists formally known as "Cycle Counts," these uniform procedures are integrated into all CVS's staff daily practices and procedures nationwide.

A.      **The CVS Prescription Processing Protocol**[7]

108.    With the presentment of a prescription, the pharmacist must inquire the identity of the person and/or third-party payer to whom the bill for payment of the prescribed medication is to be directed.

109.    If it is determined by the pharmacist that a third-party payer is to be billed for the prescription, the pharmacist will communicate with the identified third-party payer to obtain

---

[7] *See Exhibit J* - Fraudulent & Non-Fraudulent Partial Fill Process Chart

authorization for filling the prescription and to confirm payment for the prescription to be dispensed.

110.    The method of communication used by pharmacists, in undertaking to obtain authorization and confirm payment of prescriptions, is a process called "adjudication." This "adjudication" process occurs within CVS's proprietary software system, RxConnect. The process of adjudication occurs via secure networks, with the third-party payers' software programs.

111.    Approval or denial of authorization by the third-party payer to the CVS pharmacist, with respect to filling the prescription, normally occurs within ten (10) seconds.

112.    This transaction between the third-party payers and the CVS pharmacy requires a unique numerical identification code, which has been assigned individually to each third-party payer, called a BIN number or "Bank Identification Number."

113.    In response to this transmission, Medicaid as well as other third-party payers transmit an authorization back to the pharmacy letting them now that the claim is approved and that they are authorized to fill and dispense the medication(s), as prescribed to the identified customer. Medicaid as well as other third-party payers also authorize payment of the cost of the complete prescription, as prescribed, to the pharmacy.

114.    Once adjudicated by the software system, the pharmacist or technician begins processing a prescription by selecting the appropriate medication from a menu within the software system. Once the prescription itself reaches the "filling" step in the process, the user will retrieve the selected product from the inventory and verify the correct product has been selected by scanning the barcode on the drug product itself.

115.    Once the software system determines the selected products match, the process can continue through the workflow where it will be transferred into the ultimate package the patient

will receive, labeled and placed into the "will call" area where completed prescriptions are kept until the patient comes to retrieve it.

116.     For each prescription transaction, the software keeps track of the exact inventory of the particular medication, deducting the quantity dispensed from the current inventory. The quantity remaining in stock before and after each transaction is referred to as the "on-hand" quantity.

### B.     The CVS Protocol for Processing Legal Partial-Fills

117.     In undertaking to fill a prescription, a CVS pharmacist may not have a sufficient "on-hand" quantity for the medication in inventory to provide the customer with the full quantity that was prescribed.

118.     When this occurs, it is referred to within the pharmacy work environment as being "short" which results in providing the patient with some small quantity of medication referred to as a "partial-fill."

119.     One reason for the frequent occurrences of being "short" medications, is that CVS management affirmatively acts to have the individual pharmacies maintain a minimal inventory of products. Pharmacy inventory is the largest single expense in all pharmacies so the need to effectively manage purchases versus sales is a key contributor to the fiscal health of a particular pharmacy location. Pharmacy inventory management is measured in "turns." Turns are defined as the number of times a product "turns over" or is replaced by new inventory over the course of a year. The higher the turns, the more efficient the manager is at managing his or her inventory.

120.     If the pharmacy does not have enough "on-hand" quantity medication to give a patient the amount they are prescribed, under CVS policy, a pharmacy must provide the patient enough medication for seventy-two (72) hours, or three (3) days. For example, if a patient has a

prescription that calls for thirty (30) tablets of a medication and the patient is supposed to take one (1) tablet a day, but the pharmacy only has ten (10) tablets, the pharmacy will give the patient three (3) tablets so the patient has seventy-two (72) hours' worth of medication.

121.     During the course of filling a prescription the computer system may recognize that there is not enough medication in stock. When this happens, the system will first provide the pharmacist with an "out- of- stock" option. Second, the system will prompt the pharmacist or technician to select one of three options: (1) continue to dispense; (2) partial-fill; or (3) change national drug code (NDC).

122.     The preferred workflow at CVS indicates that the pharmacist should choose the out-of-stock option, then select from the secondary menu, the partial-fill option which would allow the pharmacist or technician to type the number of pills they are dispensing to the patient for seventy-two (72) hours.

123.     A single label would then print out with the specific quantity to hold the patient over for seventy-two (72) hours, with no charge due.  From our example, the label would have a quantity of three (3) tablets and zero (0) cost or copay.

124.     When the patient comes to pick up their medication, they should be informed that he or she is receiving a three (3)-day partial-fill and will not be charged a copay nor will his or her insurance be charged. To adhere to the Medicaid and Medicare Program Integrity Guidelines, the pharmacist should not prorate the price of the prescription for the quantity actually dispensed and should only bill the insurance company once the full quantity is received by the pharmacy. Thus, the patient should only pay their copay if and when they pick up the remainder of their medication.

C.     **The On-Hand Quantity of Each Medication Is Updated Following Each Completed Partial-Fill Through Both Precise Inventory Software Management and a Daily Manual Check and Balance Called a "Cycle Count"**

125.    Following each completed fill where there is sufficient inventory to fill the entire prescription, the inventory management software adjusts the on-hand quantity.

126.    Following each legal partial-fill where a three (3)-day supply is given at no initial charge, the software adjusts the on-hand quantity.

127.    Following each CVS drug warehouse order which occurs one to two (1-2) times a week, upon arrival of the medication, the software adjusts the on-hand quantity.

128.    Following each secondary drug order which can occur daily from a backup or third-party wholesaler, upon receipt of these smaller orders, the software adjusts the on-hand quantity.

129.    In addition to software management, in order to maintain an accurate and precise inventory, CVS painstakingly requests each pharmacy staff member, both pharmacists and technicians, to manually perform a partial inventory audit each and every day based off of a computer-generated partial inventory confirmation list called the cycle count list.

130.    The cycle count list which can range from zero (0) to several dozen medications daily, must be hand-counted to confirm or adjust the on-hand quantity kept by the software.

131.    The cycle count list contains commonly used medications, randomly selected medications and all medications that were filled where the pharmacist had to bypass the partial-fill protocol using the Continue to Dispense function.

**D.    When Partial-Fill Fraud Occurs, Each False Claim Can Be Traced Through the "Continue to Dispense" and "Cycle Count" Functions**

132.    Each time a fraudulent partial-fill process is initiated, the pharmacist executing the fraud starts by selecting the "Continue to Dispense" option instead of the partial-fill option upon being notified of a potential inventory deficiency. The "Continue to Dispense" function allows for the rapid processing of the prescription while delaying the reconciliation of the inventory to a later

time. This happens at the expense of the prescription payer. This also moves the prescription through the standard workflow instead of the partial-fill workflow.

133.     At the same time the "Continue to Dispense" function allows the prescription to advance through the workflow, it also drops the "on-hand" count of that product to zero (0) and adds that medication to the daily list of "Cycle Counts".

134.     This "Cycle Count" report is generated daily and is a random list of products to be counted. Cycle counts are an industry standard to ensure that the database and the shelf quantities match.  This ensures accountability for the largest asset, the inventory contained on the daily report are any drugs where the user has used the "Continue to Dispense" function. This requires the pharmacy staff manually update the "on-hand" inventory of all products on the list by the end of the day.

135.     By choosing the "Continue to Dispense option, the third-party plan is fully billed for the partial fill, and the prescription is moved to "print ready" status where the prescription label can be printed out with a full amount of copay and the full quantity of the prescription. This act equates to a single false claim.

136.     In continuing with the false claim, the pharmacist will then manually print a second label.  On the first label they will cross out the full quantity of the original prescription and write how many tablets are going to be given to the patient at this time. This practice was observed repeatedly by Relator Levison in multiple CVS locations.[8]

137.     The second label is marked with the remaining amount of the medication that the pharmacy owes the patient and is placed aside or in an "owe box" for the pharmacist to fill once the medication is available.

---

[8] *See* Exhibit H – Pictures.

138.    These second prescription labels are sometimes filled and sometimes not filled once the medication order comes in.

139.    If filled, the medication bags are set aside or placed in "will call" for pick-up.

140.    If not picked up, the medication bags are placed back in inventory for sale with no refund back to the government or other third-party payers.

141.    Documentation with respect to the identity of the customer and the amount of medication owed the customer is then discarded.

142.    For example, if the patient has a prescription for thirty (30) tablets but the pharmacy only had seven (7) in stock, the insurance gets billed for all thirty (30) even though the prescription was only filled for seven (7) and the patient only received seven (7).  The pharmacist will hand write the quantity seven (7) on the label, put those seven (7) tablets in a vial, label it, and give it to the patient who is charged their full co-pay for the medication, and then hand write the balance of twenty-three (23) on a second label to be held in a section on the counter where it waits for the remaining medication to be ordered to complete the fill.

143.    Once the medication is ordered and the fraudulent partial-fill is complete, it is the patient's responsibility to come and pick up this medication.  In this process, since the system is unaware of a partial-fill, the normal pick up reminders to pick up the balance owed such as emails, texts or phone calls are not initiated, thus increasing the likelihood that the balance does not get picked up (and is returned to stock without refund).

**E.    The Magnitude of The Damages from Fraudulent Transactions Returned to Stock Without Reimbursing the Government are Revealed Through Both "Custom Return to Stock" and "Undocumented Return to Stock" Audits[9]**

---

[9] *See* Exhibit G - Fraudulent & Non-Fraudulent Return to Stock Process Chart.

144.    When the balance of a partial-fill has been left in the "will call" pick-up bin for a period of ten to fourteen (10-14) days, it must be returned to stock. When filled legally, the computer system tracks all prescriptions waiting in "will-call" and delivers a daily list of which prescriptions need to be returned back to inventory. The prescription is then scanned, inventory "on-hand" quantity automatically adjusted, and a new return to stock label is printed and affixed to the bottle, which is then returned to active inventory. The new "on-hand" quantity in the system reflects the addition of the "returned-to-stock" medication.

145.    When a team member attempts to complete the "return to stock" process with a prescription that was fraudulently partial-filled, they will encounter an alert, post-scanning, that tells the user that the prescription in question has already been "sold" to the patient. "Sold" prescriptions are assumed dispensed to the patient and thus not available for return.  The system will halt the team member from proceeding with the process. A prescription that has been legally partially-filled and has not been dispensed to the patient would not be marked as "sold" within the software system and thus available for the return to stock process.

146.    Relator Levison has observed two (2) fraudulent methods of returning to stock without reimbursing the government: one is through "Custom Return to Stock" function; and the other by the "undocumented return to stock" method (i.e., simply dumping the medications back into the bottles).  Each fraudulent act can be traced back to individual prescriptions through different methodology.

### i.    Custom Return to Stock

147.    When CVS employees bypass the normal return process as detailed above, they must use the "Custom Return to Stock" label generation process to return the medication to active

inventory, which informs the computer of what the drug is and how many tablets will be returned back to pharmacy stock. These "Custom Return to Stock" labels are catalogued in the system.

148.    To create a "Custom Return to Stock" label, the user accesses the functionality and manually enters the quantity of tablets that will be returned, appropriate NDC number and then visually confirms the return against an image of the drug.

149.    This generates a new bottle label, with the name, strength and form of the drug, and a six (6)-month expiration date, which will be used to return the drug back into active inventory.

150.    From our example above, where seven (7) tablets were given to the patient, for an illegal partial-fill, if the patient does not pick up the balance, the twenty-three (23) tablets get put back in the inventory under the "Custom Return to Stock" mechanism.

151.    Since the patient already paid the full copay, the CVS system and the insurance company believe the patient received the full amount of medication, there is no record of the medication that is still owed.  Therefore, once the medications that are not picked up are returned back into inventory, the fraud is levied upon both the patient and the insurance company who have paid in full for the partially-filled prescription.

152.    The "Custom Return to Stock" label is generated after the balance of the fraudulently partial-filled prescription is not picked up. The label is generated for the same drug where the "Continue to Dispense" functionality was used and the "Cycle Count" was done as a result of the "on-hand" quantity dropping to zero (0).

153.    **The quantity entered to generate the "Custom Return to Stock" label indicates the quantity of medication by which CVS has fraudulently enriched their inventory.**

154.    Linking all of the pieces together shows the prescription number, BIN number and the Processor Control Number ("PCN") from the "Continue to Dispense" functionality; NDC of

the drug involved in the fraudulent partial from the cycle count process and the quantity that was returned to stock from the "Custom Return to Stock" label generation. When all of these elements are in place, the identification and verification of the fraud and magnitude of the fraud can be determined.

155.    The adjustment of "on-hand" quantities is a crucial element in the calculation of the damages.  For those instances where the CVS team member dumped the medication back into the stock bottle as opposed to generating a "Custom Return to Stock" label, the identification requires subsequent analysis.

### ii.    Undocumented Return to Stock (i.e., Dumping)

156.    While the "Custom Return-to-Stock" label can identify the specific amount of fraud, Relator Levison further observed the act of dumping pills in the bottle without a return to stock label being generated.

157.    This act of dumping renders the quantity of medication paid for, yet not dispensed, seemingly undocumented which further circumvents the detection of the fraud.

158.    Furthermore, in violation of several federal and state medication safety laws set forth above, and of serious concern regarding the health of patients who end of taking the medication, when a medication is dumped back into the stock bottle, the particular drug in question will then be misbranded due to the mixing of tablets with different expiration dates and lot numbers.

159.    As a result of dumping, inflation of the inventory occurs which can be traced and quantified through forensic analysis of data available from CVS's transaction and inventory logs. The inventory is inflated when tablets are dumped back into the stock bottles, allowing pharmacies to enhance the value of the inventory.

160.    The quantity of tablets dumped back into the stock bottle can be revealed through the examination of five (5) key pieces of information:

a.  The "Continue to Dispense" prescription quantity which indicates that a fraudulent partial-fill has occurred and reveals the total quantity of medication that was billed to the insurance;

b.  The "on-hand" quantity before the fraudulent partial-fill which is the quantity that was actually in the store when the CVS employee began filling the prescription;

c.  The order quantity for the NDC in question for the prescription being filled which will be used to fill the remainder of the partially-filled prescription;

d.  The amount of medication indicated as "on-hand" as part of the subsequent cycle count of the NDC in question which will occur in roughly ten to fourteen (10 to 14) days after the prescription is filled; and.

e.  The calculated on-hand quantity which is determined by the system based using the cycle count adjustment amounts and the order quantity.

161.    The specific changes to the inventory can be extracted by comparing the amount of medication indicated as "on-hand" as part of the subsequent cycle count ten to fourteen (10-14) days after the prescription is filled to the calculated on-hand quantity. The subtraction of the calculated on-hand amount from the amount of medication indicated as on-hand, will reveal the extent of the dumping fraud (i.e., the quantity that was billed to the insurance company but the patient did not receive).

162.    For example, a CVS employee fills and dispenses three (3) tablets for a prescription written for thirty (30) tablets and bills the insurance for the entire quantity of the prescription. When the patient fails to pick up the remainder of the prescription, the CVS employee will remove

the prescription from will call and dump the twenty-seven (27) tablets back into the stock bottle. The prescription is not credited back to the insurance company. To find the fraud, the "on-hand" quantity before the partial-fill needs to be determined. In this case, the "on-hand" quantity was ten (10) tablets before the "Continue to Dispense" process was initiated. Then, the "Continue to Dispense prescription quantity needs to be identified (thirty (30) tablets). After that, the number of tablets that came in the order needs to be determined. The order was for one hundred (100) tablets. Finally, the subsequent "Cycle Count" quantity for the same drug between ten to fourteen (10-14) days later needs to be identified. In this case, the "on-hand" quantity after the subsequent cycle count will be one hundred and seven (107) tablets. This is due to the CVS system automatically zeroing their inventory counts for all NDCs that go through the "Continue to Dispense" process.

163.    This is a fraudulent process built into the CVS system in order for the system's "on-hand" quantity to equal the actual "on-hand" quantity. This is revealed through a simple calculation: The subsequent cycle count quantity minus the sum of the "on-hand" quantity plus order quantity minus the continue to dispense quantity. For example, ten (10) tablets ("on-hand" quantity before partial-fill) plus 100 tablets ("Order") subtracted by thirty (30) tablets ("Continue to Dispense" prescription quantity) equals eighty (80) tablets ("Calculated On-Hand" quantity). Finally, if we subtract, if we subtract the subsequent "System's On-Hand" from the "Calculated On-Hand" quantity, we will find the fraudulent number of tablets the insurance company paid for but the patient did not receive. One hundred and seven (107) tablets (subsequent "System's On-Hand" quantity) subtracted by eighty (80) tablets ("Calculated On-Hand" quantity) equals twenty-seven (27) tablets (fraudulent number of tablets the patient did not receive)

164.    Alternatively, the fraud is also revealed through the examination of the internal "Continue to Dispense" transactions, which results in a negative inventory within the system,

which appears as a zero balance for the CVS staff to hand count and adjust through their scheduled "Cycle Count".

165.    When CVS Employees bypass the normal inventory return process by simply dumping the pills back into the bottle, that quantity dumped is revealed through subsequent "Cycle Count" of that particular drug.

166.    When CVS Employees bypass both the customary return process and the "Custom Return to Stock" protocol by dumping the pills back into the bottle, the amount of the return is revealed through the examination of three pieces of information: (1) record of the initial "Continue to Dispense;" (2) records of the initial "Cycle Count;" and (3) a subsequent "Cycle Count" at the same drug some ten to fourteen (10-14) days later**.** The specific adjustments to the inventory "on-hand" quantity details the extent of the dumping fraud.

167.    The following charts, also attached hereto as Exhibits F and G, are instructive.





F.      **The Damages Are Traceable to Individual Transactions Through Forensic Analysis of CVS's "On-Hand" Quantity Changes and Software "Continue to Dispense," "Cycle Count" and "Custom Return to Stock" Logs**

168.    Damages in terms of quantity of medication paid for by government-funded plans yet not dispensed, are traceable back to individual transactions regardless of the method of circumvention used to return the medication back into stock.

169.    Modifications to the "on-hand" quantity of a particular drug, which occur both manually and automated, illuminate a clear pathway connecting a particular fraudulent partial-fill transaction to a precise measure of medication returned to stock via fraudulent processes.

170.    The prescriptions that are deemed false claims because they are fully billed on partial-fills are first identified through observing collectively both a "Continue to Dispense" transaction and a "Cycle Count" on the same day.

171.    The "Continue to Dispense" functionality is the first piece of information indicating a fraudulent partial fill transaction which contains the prescription number, BIN and PCN.

172.     The use of the "Continue to Dispense" function then causes the "on-hand" quantity to reset at zero (0), and places that particular drug on the daily "Cycle Count" list, mandating a manual count to update the precise inventory "on-hand" quantity of a drug. This associated "Cycle Count" is the second marker confirming which partial-fills were filled fraudulently.

173.     From the partial-fills that are identified as fraudulent, a significant percentage of these fraudulent partial-fills are eventually returned back into stock without reimbursing the government /third-party plans. These prescriptions can be identified and quantified through examining certain manual modifications made to the inventory data that shows increases to particular "on-hand" drug quantities

174.     Whether through use of "Custom Return to Stock" function or simply dumping of medications back into stock, loss can quantifiably be traced back to the individual transactions through capturing data showing increases in "on-hand" inventory and subsequent inventory valuations done throughout the fiscal year.

175.     By way of example, comparing the correct standard processing method to two (2) fraudulent partial-fill examples, one utilizing the custom return to stock method and the other utilizing the dumping method, one can easily distinguish how damages are identified and calculated through observing how the fraudulent transactions the "on-hand" quantities.

176.     Example 1, shows the changes in "on-hand" quantity when a pharmacist correctly fills a prescription using the standard processing methodology where the prescription calls for thirty (30) tablets, there are ten (10) tablets of Drug X "on-hand", and the pharmacist dispenses three (3) tablets using the legal framework where the full amount is not billed until the full balance is received.



177.    Example 2, shows the changes in "on-hand" quantity when a pharmacist performs a "Custom Return to Stock" fraud where the prescription calls for thirty (30) tablets, there are ten (10) tablets of Drug X "on-hand", the pharmacist dispenses three (3) tablets, bills for thirty (3)0 tablets and the balance of twenty-seven (27) is returned to inventory using the "Custom Return to Stock" method.



178.    Example 3, shows the changes in "on-hand" quantity when a pharmacist performs a dumping fraud where the prescription calls for thirty (30) tablets, there are ten (10_ tablets of

Drug X "on-hand", the pharmacist dispenses three (3) tablets, bills for thirty (30) tablets and the balance of twenty-seven (27) is returned to inventory using the dumping method.



179.    Each example above can be modified using various variables of "on-hand" quantities, quantities dispensed, etc. to pinpoint the damages regardless of changes in the variables.

## II.   RELATOR LEVISON'S DIRECT EVIDENCE OF "FULL-BILL, PARTIAL FILL" FRAUD AT MULTIPLE STORES[10]

180.    Relator Levison observed thousands of illegal partial-fills while working at multiple CVS pharmacies in the New York metro area. He acquired photographic evidence of several transactions he observed.

181.    On 11/22/2015, Levison observed a false claim to Medco Express Scripts with date of service 11/10/2015, for 12 tablets of ketorolac 10 mg sold at CVS store 3096, Bronx, New York. A prescription bag containing a prescription vial of 2 tablets of ketorolac 10 mg was observed with

---

[10] See Exhibit H - Direct Photographic Evidence of Fraud Within Various CVS Stores.

a handwritten note "Balance 2 tabs". The barcode was covered with tape to indicate that the customer has already paid in full.  *See* Exhibit H - Photo 1.

182.    On 11/22/2015, Levison observed a false claim to State funded plan called Affinity Health Plan, with date of service 05/08/2015, for 30 tablets of Naproxen Sodium 550mg sold at CVS store 3096, Bronx, New York. A prescription bag containing a prescription vial of 9 tablets Naproxen Sodium 550mg was observed with handwritten notes "Balance 9" and "different manufacturer".  A green sticker was attached to the bag to indicate to the customer that the tablets will look different from the original ones given around 5/8/2015. The barcode was covered with tape so that it could not be scanned and sold again. *See* Exhibit H - Photo 2.

183.    On 11/22/2015, Levison observed a false claim to Caremark with date of service 09/08/2015, for 84 tablets of Junel 1.5 mg-30mg sold at CVS store 3096, Bronx, New York. A prescription bag containing a prescription of 1 packet Junel 1.5mg-30mg was observed with a handwritten note "owe 1 pack (21 count)". The barcode was covered with tape to indicate that the customer has already paid in full.  *See* Exhibit H - Photo 3.

184.    On 11/22/2015, Levison observed a false claim to Aetna with date of service 10/21/2015, for 4 bottles (400 mL) of Amox TR-K CLV 600-42.9/5 Susp sold at CVS store 3096, Bronx, New York. A prescription label, with a handwritten note "mix" and "owe 200 mL" was observed. The barcode was covered with tape to indicate that the customer has already paid in full. *See* Exhibit H - Photo 4.

185.    On 11/22/2015, Levison observed a false claim to Medco Express Scripts with date of service 11/11/2015, for 90 tablets of Synthroid 100 mg sold at CVS store 3096, Bronx, New York. A label for 90 tablets of Synthroid 100 mg was observed with a handwritten note "Balance

= 60". The barcode was covered with tape to indicate that the customer has already paid in full. *See* Exhibit H - Photo 5.

186.    On 11/22/2015, Levison observed a false claim to a government funded Part D drug plan with date of service 11/19/2015, for 90 tablets of Synthroid 125 mg sold at CVS store 3096, Bronx, New York. A label for 8 tablets of Synthroid 125 mg was observed with a handwritten note "Owe 8".  *See* Exhibit H - Photo 5.

187.    On 01/14/2016, Levison observed a false claim to Aetna with date of service 12/31/2015, for 40 capsules of Fioricet 50-300-40 mg capsule sold at CVS store 3096, Bronx, New York. A label for 2 capsules of Fioricet 50-300-40 mg was observed with a handwritten note "Owe 2 pills". The barcode was covered with tape to indicate that the customer has already paid in full. *See* Exhibit H - Photo 6.

188.    On 01/14/2016, Levison observed a false claim to Medco Express Scripts with date of service 01/12/2016, for 10 grams of Bactroban 2% Nasal Ointment sold at CVS store 3096, Bronx, New York. A prescription bag containing a prescription of 6 tubes of Bactroban 2% Nasal Ointment was observed with a handwritten note "Owe 6 tubes". The barcode was covered with tape to indicate that the customer has already paid in full. *See* Exhibit H - Photo 7.

189.    01/18/2016, Levison observed a false claim to Federal Employee Health Plan with date of service 11/27/2015, for 90 tablets of warfarin 6 mg sold at CVS store 3096, Bronx, New York. A prescription bag containing a prescription vial of 9 tablets of warfarin 6 mg was observed with a handwritten note "Balance of 9". *See* Exhibit H - Photo 8.

190.    On 01/30/2016, Levison observed a false claim to government funded plan World Trade Center Health with date of service 01/27/2016, for 15 bottles of Sodium Chloride 0.9% Irrigation sold at CVS store 3096, Bronx, New York. A label for 15 bottles of Sodium Chloride

0.9% Irrigation was observed with a handwritten note "We Owe 2 Bottles" and "Order for Friday 1/29/16". *See* Exhibit H - Photo 9.

191. On 01/30/2016, Levison observed a false claim to government funded plans Part D and EPIC with date of service 01/28/2016, for 60 capsules of Pradaxa 150mg sold at CVS store 3096, Bronx, New York. A label for 26 capsules of Pradaxa 150 mg was observed with a handwritten note "Balance 26". The barcode was covered with tape to indicate that the customer has already paid in full. *See* Exhibit H - Photo 9.

192. Two (2) weeks later, on 02/15/2016, Levison observed the same false claim to government funded plans Part D and EPIC with date of service 01/28/2016, for 60 capsules of Pradaxa 150mg sold at CVS store 3096, Bronx, New York. The same label for 26 capsules of Pradaxa 150 mg was observed with a handwritten note "Balance 26" and was now attached to an unopened bottle of Pradaxa 150mg capsules. A note "Do not open until they come in" was observed to be attached to the bottle of Pradaxa. The barcode was covered with tape to indicate that the customer has already paid in full. *See* Exhibit H - Photo 10.

193. Nine (9) days later, on 02/24/2016, Relator Gregory Levison observed the same false claim to government funded plans Part D and EPIC with date of service 01/28/2016, for 60 capsules of Pradaxa 150mg sold at CVS store 3096, Bronx, New York. The same label for 26 capsules of Pradaxa 150 mg was observed with the same handwritten note "Balance 26" attached to the unopened bottle of Pradaxa 150mg capsules. The note "Do not open until they come in" was still observed to be attached to the bottle of Pradaxa. The barcode was covered with tape to indicate that the customer has already paid in full. *See Exhibit H* - Photo 11.

194. On 02/22/2016, Levison observed a false claim to government funded plan New York Medicaid with date of service 02/18/2016, for 2 Bottles of (30 mL) of Azithromycin

100mg/5mL suspension sold at CVS store 3096, Bronx, New York. A handwritten note "owe 15 mL" was written on the label and the label was attached to a 15 mL bottle of Azithromycin 100mg/5mL. The barcode was covered with tape to indicate that the customer has already paid in full. *See* Exhibit H - Photo 12.

195.    On 02/24/2016, Levison observed the same false claim to government funded plan New York Medicaid with date of service 02/18/2016, for 2 Bottles of (30 mL) of Azithromycin 100mg/5mL suspension sold at CVS store 3096, Bronx, New York.  A handwritten note "owe 15 mL" was still written on the label and the label was still attached to a 15 mL bottle of Azithromycin 100mg/5mL. The barcode was covered with tape to indicate that the customer has already paid in full. *See* Exhibit H - Photo 11.

196.    On 03/09/2016, Levison observed a false claim to government funded plans Part D and EPIC with date of service 03/09/2016, for 90 tablets of Mybertic 25 mg sold at CVS store 3096, Bronx, New York. A label for 90 tablets of Mybertic 25 mg was observed with a handwritten note "Owe 1 box". The barcode was covered with tape to indicate that the customer has already paid in full.  It was next to a duplicate label of 90 tablets of Mybertic 25 mg. *See* Exhibit H - Photo 13

197.    On 03/27/2016, Levison observed a false claim to government funded plan Affinity Health Plan with date of service 03/09/2016, for 1 Qvar 80 ug inhaler sold at CVS store 3096, Bronx, New York. A bag containing 1 Qvar 80 ug inhaler was observed with a handwritten note "Owe". *See* Exhibit H - Photo 14.

198.    On 03/27/2016 Levison observed a false claim to government funded plan Affinity Health Plan with date of service 03/26/2016, for 4 bottles (300 mL) of Amox TR-K CLV 600-42.9/5 Susp sold at CVS store 3096, Bronx, New York.  A prescription label, with a handwritten

note "owe 75 mL Mon" was observed. The barcode was covered with tape to indicate that the customer has already paid in full. *See* Exhibit H - Photo 15.

199.    On 07/03/2016, Levison observed a false claim to government funded Part D plan with date of service 06/15/2016, for 20 capsules of Nitrofurantoin MCR 100 mg Cap sold at CVS store 3096, Bronx, New York. A prescription bag containing a prescription vial of 2 capsules of Nitrofurantoin MCR 100 mg Cap was observed with a handwritten note "Owe 2". The barcode was covered with tape to indicate that the customer has already paid in full. *See* Exhibit H - Photo 16.

200.    On 07/03/2016, Levison observed a false claim to a drug discount card with date of service 06/14/2016, for 60 capsules of Vitamin 400 unit softgel capsules sold at CVS store 3096, Bronx, New York. A prescription bag containing a prescription vial of 8 capsules Vitamin 400 unit softgel was observed with a handwritten note "We Owe 8".  The barcode was covered with tape to indicate that the customer has already paid in full.  *See* Exhibit H - Photo 16.

201.    On 09/16/2016, Levison observed a false claim to Caremark with date of service 09/15/2016 for 60 tablets of Ibuprofen 600 mg sold at CVS store 2360, Manhattan, New York.  A label for 60 tablets of Ibuprofen 600mg was observed with a handwritten note of "gave 28 owe 32" and "Paid". The barcode was covered with tape with "Paid" written on it to indicate that the customer has already paid in full.  *See* Exhibit H - Photo 17.

202.    On 09/23/2016, Levison observed a false claim to a drug discount card with date of service 09/10/2016, for 10 syringes sold at CVS store 3096, Bronx, New York. A prescription bag containing BD syringes was observed with a handwritten note "6mm". The barcode was covered with tape to indicate that the customer has already paid in full.  *See* Exhibit H - Photo 18.

203.    On 09/23/2016, Levison observed a false claim to a government funded plan Part D with date of service 07/29/2016, for 270 tablets of Buspirone 5 mg tablets sold at CVS store 3096, Bronx, New York. A prescription bag containing a prescription vial of 25 tablets was observed with a handwritten note "Owe #25". The barcode was covered with tape to indicate that the customer has already paid in full.  *See* Exhibit H - Photo 18.

204.    On 04/23/2017, Levison observed a false claim to Caremark with date of service 04/21/2017 for 400 OneTouch ultra test strips sold at CVS store 3096, Bronx, New York. A label for 400 one touch ultra test strips was observed with handwritten notes of "Owe 300 gave 100 fri" and "Owe 300". The barcode was covered with tape to indicate that the customer has already paid in full. *See* Exhibit H - Photo 19.

205.    On 09/02/2017, Levison observed a false claim to a government funded plan Part D with date of service 08/27/2017, for 90 capsules of paricalcitol 1 mcg sold at CVS store 6048, Staten Island, New York. A prescription bag containing a prescription vial of 60 capsules was observed with handwritten notes "Owe 60", and "Paid".  The barcode was covered with tape and marked "Paid" to indicate that the customer has already paid in full. *See* Exhibit H - Photo 20.

## III.    COMPLAINTS AND SCOPE OF THE FRAUD

206.    From 2015 to 2017, Levison voiced his concern about false claims act violations from full-bill partial-fill conduct to various CVS pharmacists, including Kathleen Nicoletti and Roxana Aminova.

207.    On December 19, 2018, Levison sent official notifications to CVS management informing them of rampant full-bill partial-fills violations throughout New York. This notification email was sent to  New York City area District Leaders Jose Coca and Sue Alpertti and the Regional Loss Prevention Manager-NY/CT Region, Kevin Charles.

208.     The "Full-Bill, Partial-Fill" schemes are not limited to New York.

209.     For example, from 2019 to 2020, Levison was provided photographic evidence of full-bill partial-fills violations in California by a former CVS pharmacist in a high-volume CVS Pharmacy in California.

210.     Levison was also provided copies of emails that the pharmacist in California had sent CVS management and executive in California, voicing his concerns of false claims violations involving "Full-Bill, Partial-Fills" conduct at his CVS pharmacy through rampant use of the "Continued to Dispense" function.

## IV.   CVS INCENTIVIZES PHARMACISTS TO ENGAGE IN THE FRAUD

211.     In order to ensure continual growth and compliance of its team members, CVS has implemented an incentive plan that rewards the achievement of goals and metrics through bonuses and merit raises. Each pharmacist's performance is measured against this preset list of components and scorecard metrics which will determine his/her bonus and merit raise.[11]

212.     The annual merit raise is based upon the year end performance review. A major component, holding sixty percent (60%) of the weight for the individual annual merit raise, is the "Business Results & Related Behaviors." This contains five (5) components which cover basic pharmacy business metrics such as prescription counts, inventory excellence and customer satisfaction. There are two (2) additional components that measure enrollments in CVS programs. The business metrics that are positively impacted by the fraudulent partial-fill process are "Inventory Excellence Score Card Score to Target," "Scripts to Budget,'" and "My Customer Experience Scorecard Score to Target." These components also overlap as part of the annual bonus calculation.

---

[11] *See* Exhibit L - CVS Performance Review.

213.    The "Inventory Excellence Scorecard Score to Target" contains a specific component that measures the number of partial-fills that a pharmacist completes during the year. A pharmacist's success is measured based on the number of partial-fills that his/her store generates because the greater the number of partial-fills is an indication that the inventory level is not optimized for customer service. The threshold is arbitrarily set by CVS as part of their bonus program. The theory being that an increase in partial refills negatively affects patient satisfaction scores measured within the "My Customer Experience Scorecard Score to Target".

214.    Pharmacists who exceed the predetermined threshold for partial refills are negatively impacted by a lower bonus and thus incentivized to bypass the process. When a pharmacist circumvents the partial process with the fraudulent one, they are improving the metrics that determine both their annual raise calculation and bonus eligibility.

215.    An additional component to the "Inventory Excellence Score Card Score to Target" is the measurement of the percentage of medications purchased outside of the CVS warehouse. The CVS warehouse is the lowest cost option for obtaining inventory to fill prescriptions. In the normal partial-fill process, the pharmacists are providing the patients a seventy-two (72)-hour supply. When pharmacists are held to the strict seventy-two (72)-hour supply of the legal partial-fill process, this counts against them as many times the product will not arrive in time to meet the seventy-two (72)-hour deadline. They then must order the product from the secondary wholesaler at a higher cost. Thus, the fraudulent process allows the pharmacists the leeway to provide the patient with enough medication until the next regular CVS warehouse delivery. This keeps them on target for the percentage threshold for warehouse vs wholesaler purchases.

216.    The "Scripts to Target" business metric is also positively impacted via the fraudulent process when the prescription that was fraudulently partially-filled is not picked up and

then returned to stock, it is still counted towards the annual prescription goal. Since these prescriptions are not voided and credited back to the government plan, this positively impacts the "Scripts Component" of the annual raise and bonus calculations.

217.    Lastly, the "My Patient Care" enrollment metric is positively impacted each time a fraudulent partial-fill is booked as a regular full sale. This permits the pharmacist to enroll that patient in "My Patient Care" outcomes programs whereas legal partially-filled prescriptions are not eligible for the program. Pharmacists are measured on the number of enrollees into the program as part of the annual bonus calculation, the lower number of enrollees, the lower the performance rating for that pharmacist.

## DAMAGES

218.    The precise number of false and fraudulent claims submitted by CVS as set forth in the instant Complaint, and the amount of monies wrongfully obtained as a result of the false and fraudulent claims, can be definitively established through examination of CVS's internal software data.

219.    The Relators submit that pulling the "Continue to Dispense" and the "Custom Return to Stock" data, along with "Cycle Count" logs and "on-hand" quantity data logs, will pinpoint both the particular claim and dollar value of the fraud by Medicaid/Medicare and other government programs from 2011 to present, as a result of the "Fully-Billed, Partially-Filled" prescriptions.

220.    Each transaction executed using the "Continue to Dispense" function will yield a list of suspect prescriptions and associated NDC's that must then be cross referenced against the NDC of the drug products that are cycle counted each day. For those drug products/NDC's where

the resultant on-hand still remains zero (0), those prescriptions can be considered to be fraudulently partially-filled, with each being considered an individual false claim.

221.    To then determine the quantity of pills (or other medication forms) returned back into stock without reimbursing the United States and the State of New York, both the "Custom Return to Stock" method and dumping method must be analyzed using distinct data points.

222.    To determine the precise number of medications that were returned through the "Custom Return to Stock" method, that were initially dispensed through using the "Continue to Dispense" function and identified as partially dispensed false claims, you simply must run a report of all transactions of the "Custom Return to Stock" printed labels. That report will yield the prescription number associated with each prescription returned to stock by the CVS team member using the "Custom Return to Stock" process. As previously discussed herein, the "Custom Return to Stock" process is only utilized after a CVS team member received notice that a prescription being returned to stock had already been sold at full price. The number of prescriptions and associated prescription numbers will yield the precise number of medications that has been returned without reimbursing the third-party payer.[12]

223.    In addition to the "Custom Return to Stock" method, many prescriptions were simply returned through dumping the pills back into the containers. To determine the precise number of medications returned through the dumping method, you must determine the value of inventory identified as "Swell", "Inventory Write On" or "Positive Shrink." To determine the exact amount that was dumped back into the inventory, you must first determine the additional inventory that is added back in the stock and is now available for dispensing. This is identified through examining the change in "on-hand" quantity which is revealed in subsequent "Cycle Counts" of a

---

[12] *See* Exhibit F.

particular medication. As discussed previously, "Cycle Counts", which are the internal "on-hand" quantity check and balance will show an increase in "on-hand" quantity following the "Cycle Count" of a particular drug that was in the cohort of suspect "Continue to Dispense" transactions that were initially fraudulently partially-filled. *Id.*

224.     Exhibit F attached hereto highlights the various impacts that the suspect "Continue to Dispense", "Custom Return to Stock" and dumping have on the "on hand" quantities. A review of each of these transactions can be performed in which the adjusted "on hand" quantities can be calculated and attached to a particular prescription number.

225.     Based upon Levison's work experience at CVS pharmacies and direct eye witness evidence of CVS fraud, the Relators have exposed that approximately two percent (2%) of all new and refilled transactions utilize the unlawful "Full-Bill, Partial Fill" scheme through the "Continue to Dispense" method, with 50% of these unlawful prescriptions being returned to stock without reimbursing the government, yielding a one percent (1%) fraud rate.

226.     Nationally, one hundred seventy-seven million, fifty-four thousand, seven hundred ninety-nine (177,054,799) prescriptions, and in the state of New York, fifteen million, four hundred and three thousand, seven hundred and sixty-seven (15,403,767) prescriptions, were billed through Medicare, Medicaid and other New York State funded health plans in 2018 according to Kaiser Family Foundation at a median cost of $74.85[13] per prescription.[14]

227.     One percent (1%) of those prescriptions which were billed by CVS and returned to stock without reimbursing Medicare or Medicaid equates to over one million seven hundred

---

[13] The $74.85 national average price per prescription in 2019 is tabulated by multiplying nationwide pharmacy sales ($407,115,052,868), by the percentage of prescription retail sales versus over-the-counter sales (80.54%) then divided by the total of prescriptions filled (4,380,000,000). This date is sourced from the Kaiser Family Foundation and Statista.

[14] On a national scale, the number of prescriptions billed to Medicaid and Medicare by CVS in 2018 was 177,054,799 according to Kaiser Family Foundation

thousand (1,700,000) prescriptions nationally and one hundred and fifty thousand (150,000) prescriptions in New York State in 2018 alone.

228.    With an average loss to the government of approximately seventy-four dollars and eighty-five cents ($74.85) per prescription, the annual monetary loss exceeds one hundred twenty-seven million dollars ($127,000,000.00) annually nationwide, with eleven million dollars ($11,000,000.00) attributed to New York in 2018.

229.    Extrapolating this amount over the FCA's six (6) years statute of limitation period equates to over three hundred sixty million dollars ($360,000,000.00) in monetary damages for medications paid for yet not dispensed.

230.    Extrapolating this amount over the NY FCA's ten (10) years statute of limitations period equates to over one hundred million dollars ($100,000,000.00) in monetary damages in New York State alone.

231.    Notwithstanding the direct loss from the partial-fill fraud, there are additional penalties per violation for each partial-fill transaction where the entire amount was billed, independent of whether the product was returned to stock or not.

232.    Based upon the statutory civil penalty of not less than $11,181.00 and not more than $23,361.00 for each violation of FCA and NY FCA, Levison submits that the statutory civil penalty assessed against the Defendant, CVS, should be based on the total number of fraudulent "Continue to Dispense" transactions, which he observed to be two percent (2%) of all transactions. That percentage is tabulated by taking ten percent (10%) of all partial-filled medications which occurs twenty percent (20%) of the time.

233.    Two percent (2%) of CVS's annual prescriptions or approximately three million four hundred thousand (3,400,000) prescriptions in 2018, were billed fraudulently through the

"Continue to Dispense" function, and account for individual false claims punishable by an $11,181.00 fine equating to over three billion seven hundred million dollars ($3,700,000,000.00) in 2018 alone.

234.    Thus, total damages (statutory and monetary) equate to over three billion eight hundred million dollars ($3,800,000,000.00) owed to the government as a result of the fraudulent scheme set forth herein in 2018 alone.

## FIRST CAUSE OF ACTION
### Violation of the False Claims Act

235.    Relators repeat and reiterate each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

236.    This is a civil action brought by Relators, on behalf of the United States of America, against Defendants under the federal False Claims Act, 31 U.S.C. § 3729(a)(1), (2).

237.    The Defendant, acting through its pharmacy employees, knowingly submitted and caused to be submitted false and fraudulent claims for payment of prescription medications, by monies from federally funded programs, each time it submitted a claim for the full prescription but furnished the federally-funded programs' recipient only a portion of the prescription medication due to a lack of a full inventory of the medication as prescribed.

238.    Relators submit that CVS employees were aware of the fraudulent acts as hereinbefore set out, specifically, the billing of third-party payers/federal government for payment of full and/or complete prescriptions, when a prescription was actually filled "short." This billing policy resulted in CVS receiving a greater amount of money than they were entitled to and constitute a violation of the federal FCA.

239.    CVS in utilizing this billing procedure was receiving monies, by and through the Medicaid, Medicare and other federally-funded programs, wherein the programs' managers were

operating on the mistaken belief that all prescriptions filled and dispensed by CVS pharmacist to all federally-funded program recipients were full and/or complete when payments were billed to the program.

240.   Based upon these false and fraudulent submission of claims, the Defendant received monies paid to it by the United State through all federally-funded programs.

241.   Defendant violated the FCA in that the Defendants knowingly (i.e., had actual knowledge, acted in deliberate ignorance of the truth, or acting with reckless disregard of the truth) presented or caused to be presented to the United States false or fraudulent claims   for payment.

242.   By virtue of the false or fraudulent claims that the Defendant caused to be presented, the United States has suffered actual damages and is entitled to recover damages and a civil penalty for each false claim, together with an award of attorneys' fees, costs, disbursements, and all other relief available under the FCA and applicable law. In addition, as allowed by the Statute, the Relators are entitled to a portion of any recovery obtained in this matter, together with attorneys' fees, costs, disbursements, and all other relief available under the FCA and applicable law.

## SECOND CAUSE OF ACTION
### Violation of the New York False Claims Act

243.   Relators repeat and reiterate each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

244.   This is a civil action brought by Relators, on behalf of the State of New York, against Defendant under the New York False Claims Act, N.Y. State Fin. Law § 187, *et seq*.

245.   Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented a false or fraudulent claim for payment or approval to the State of New York, the City

of New York and/or other state or local government agencies, in violation of N.Y. State Fin. Law § 189(1)(a).

246.    The Defendant, acting through its pharmacy employees, knowingly submitted and caused to be submitted false and fraudulent claims for payment of prescription medications, by monies from New York State funded programs, each time it submitted a claim for the full prescription but furnished the federally-funded programs' recipient only a portion of the prescription medication due to a lack of a full inventory of the medication as prescribed. Such claims were false claims submitted in violation of the NY FCA. Defendants knew, or acted in reckless disregard, of the fact that they were ineligible for payments demanded.

247.    Relators submit that CVS employees were aware of the fraudulent acts as hereinbefore set out, specifically, the billing of third-party payers/New York State government for payment of full and/or complete prescriptions, when a prescription was actually filled "short." This billing policy resulted in CVS receiving a greater amount of money than they were entitled to and constitute a violation of the NY FCA.

248.    CVS in utilizing this billing procedure was receiving monies, by and through the Medicaid, Medicare and other New York State funded programs, wherein the programs' managers were operating on the mistaken belief that all prescriptions filled and dispensed by CVS pharmacist to all New York State funded program recipients were full and/or complete when payments were billed to the program.

249.    Based upon these false and fraudulent submission of claims, the Defendant received monies paid to it by New York State through all New York State funded programs.

250.    Defendant violated the NY FCA in that the Defendants knowingly (i.e., had actual knowledge, acted in deliberate ignorance of the truth, or acting with reckless disregard of the truth) presented or caused to be presented to the United States false or fraudulent claims   for payment.

251.    By virtue of the false or fraudulent claims that the Defendant caused to be presented, New York State has suffered actual damages and is entitled to recover damages and a civil penalty for each false claim, together with an award of attorneys' fees, costs, disbursements, and all other relief available under the NY FCA and applicable law. In addition, as allowed by the Statute, the Relators are entitled to a portion of any recovery obtained in this matter, together with attorneys' fees, costs, disbursements, and all other relief available under the NY FCA and applicable law.

252.    As a result of Defendant's actions, set forth above, the state of New York, the city of New York and/or other state and local government agencies have been and continue to be severely damaged.

### THIRD CAUSE OF ACTION
**Unjust Enrichment**

253.    Relators repeat and reiterate each and every allegation set forth in the preceding paragraphs as though fully set forth herein.

254.    Relators submit that in performing the acts hereinbefore set out, the Defendant, through the acts of its employees, was paid monies by and through all state funded programs for which the United States and the State of New York received no benefit and to which the Defendant was not entitled.

255.    By reason of these payments the Defendant has been unjustly enriched at the expense of the United States and the State of New York.

256.    The plaintiffs are entitled to damages in the amount the Defendant was unjustly enriched.

## PRAYER FOR RELIEF

WHEREFORE, Relators, on behalf of the United States and the State of New York, demand that judgement be entered in plaintiffs' favor and against Defendant:

a.  That Defendant be ordered to cease and desist from submitting or causing to be submitted any additional false claims;

b.  directing, with respect to each Cause of Action, that Defendant, pursuant to the FCA and the NY FCA, pay an amount equal to three (3) times the amount of damages sustained by the United States and the State of New York.

c.  directing that Defendant, pursuant to the FCA pay penalties of not less than $11,181.00 and not more than $23,331.00, for each such Defendant's violations of federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

d.  directing that Defendant, pursuant to the NYFCA pay penalties of not less than $11,181.00 and not more than $23,331.00, for each such Defendant's violations of N.Y. State Finance Law §§ 187 *et seq.*

e.  Relators' shares should include 15% to 30% of recovery for all monies obtained by state and local governments including, but not limited to, all proceeds from any related actions, all attorney's fees and costs recovered by state and local governments and any consequential damages awarded to the State or to local governments;

f.  that in the event the government continues to proceed with this action, the Relator be awarded an amount for bringing this action of at least 15% but not more than

25% of the proceeds of the actions or settlement of the claims under the federal

False Claims Act and the New York False Claims Act;

g.  that in the event that the government does not proceed with this action, the Relator

be awarded an amount that the Court decides is reasonable for collecting the civil

penalty and damages, which shall be not less than 25% nor more than 30% of the

proceeds of the action or settlement of the claims under the federal False Claims

Act and the New York False Claims Act;

h.  that Relators be awarded prejudgment interest;

i.  that Relators be granted any and all preliminary and injunctive relief the Court

deems appropriate;

j.  that Relators be awarded all costs incurred in bringing this action, including

attorney's and expert fees;

k.  Such other and further relief as this Court deems just and proper

## JURY DEMAND

Relators hereby demand a trial by jury of any issue of fact triable of right by a jury.

Dated:  New York, New York
         July 14, 2021

                              Respectfully Submitted,

                              **KANE & ASSOCIATES, LLC**

                              _____

                              David C. Kane, Esq. (to be admitted *pro hac vice*)
                              1845 Walnut Street, Suite 1300
                              Philadelphia, PA 19103
                              (215) 600-0928


                              **PELTON GRAHAM LLC**

By: _____

Brent E. Pelton
Taylor B. Graham
Alison L. Mangiatordi
111 Broadway, Suite 1503
New York, New York 10006
Telephone: (212) 385-9700
Facsimile: (212) 385-0800

*Attorneys for Relators*